IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

WILLIE L. GLENN (as Personal      *
Representative of the Estate of
Lester Zachary), and KAREN        *
ZACHARY (Individually, and As
Next Friend of Lester Zachary),   *

    Plaintiffs,                   *

vs.                               *      CASE NO. 4:07-CV-52 (CDL)

CITY OF COLUMBUS, GEORGIA/        *
CONSOLIDATED GOVERNMENT OF
COLUMBUS, GEORGIA, RICHARD BOREN  *
(Individually, and in his
Official Capacity as Chief of     *
Police), GARY A. BOLEN
(Individually, and in his         *
Official Capacity), KENNETH
HUDSON (Individually, and in his  *
Official Capacity), JOSEPH COATS
(Individually), GREGORY           *
TOUCHBERRY (Individually), and
JOHN DOE (1-3),                   *

    Defendants.                   *

_____

O R D E R

    This action arises from the death of Lester Zachary ("Zachary").

Zachary died after a stand-off with Columbus police officers during

which Zachary was shot twice with a beanbag munition.  Plaintiffs

seek to hold Defendants liable under 42 U.S.C. § 1983 ("§ 1983") for

violating Zachary's Fourth Amendment rights to be free from

unreasonable seizures and from the use of excessive force.

Plaintiffs also contend that Defendants' actions give rise to a

Fourteenth Amendment substantive due process claim, a civil

conspiracy claim under 42 U.S.C. § 1985(3), a First Amendment claim, an equal protection claim, and various claims under Georgia law.

Presently pending before the Court is Defendants' Motion for Summary Judgment (Doc. 39).[1]   For the reasons set forth below, Defendants' motion is granted in part and denied in part.[2]   As discussed below, the Court finds that genuine issues of material fact exist as to the following claims:

1.    Plaintiffs' § 1983 claims against Columbus for excessive force.

2.    Plaintiffs' § 1983 individual capacity claims against Bolen, Coats, Hudson and Touchberry for excessive force.

3.    Plaintiffs' assault and battery claims against Coats, Hudson and Touchberry.

4.    Plaintiffs' intentional infliction of emotional distress claims against Coats, Hudson and Touchberry.

The Court grants Defendants' motion for summary judgment as to the remaining claims.

---

[1] Plaintiffs made motions to exclude Defendants' reply brief, reply regarding the statement of material facts and affidavits submitted with their reply brief (Docs. 58 & 59).  As discussed at the November 5, 2008 hearing on the summary judgment motions, the Court finds that Plaintiffs' motions to exclude are without merit, and the Court denies those motions. The Court will therefore consider Defendants' reply affidavits to the extent they are relevant, and the Court will consider Defendants' reply briefing to the extent it is helpful.

[2] Plaintiffs make a "Counter-Motion" for Summary Judgment (Docs. 48 & 51).   As discussed below, the Court finds that genuine issues of material fact exist on each of Plaintiffs' surviving claims, so summary judgment is not appropriate, and Plaintiffs' motion is denied.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A central purpose of the summary judgment rule is "to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact. *See id.* at 323. To meet this burden, the movant may point the court to "affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) (internal quotation marks and citations omitted). In the alternative, the movant may show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. This is because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

Once the summary judgment movant meets its burden, the burden shifts and the nonmoving party must produce evidence to show that there *is* a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 324. The nonmoving party "must go beyond the pleadings," *id.,* and point the Court to "specific facts showing a genuine issue

3

for trial." Fed. R. Civ. P. 56(e)(2); *accord Celotex Corp.*, 477 U.S. at 324.  The nonmoving party is not required to produce evidence in a form that would be admissible at trial, but it must point to some evidence to show a genuine issue of material fact.  *Id.*  Such evidence may be in the form of affidavits, depositions, answers to interrogatories or admissions on file.  *Celotex Corp.*, 477 U.S. at 324; *accord* Fed. R. Civ. P. 56(e).

The movant is entitled to summary judgment if, after construing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in favor of the nonmoving party, no genuine issues of material fact remain to be tried.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). It is not enough to have *some* alleged factual dispute; there must be a genuine issue of material fact to defeat a motion for summary judgment.  *Anderson*, 477 U.S. at 247-48.  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Anderson*, 477 U.S. at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party—there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Anderson*, 477 U.S. at 248.

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiff, the record reveals the following:

4

## I.    The Parties

Lester Zachary ("Zachary"), a black male, died after a stand-off with Columbus Consolidated Government ("Columbus" or "the City") police officers during which he was shot twice with a beanbag munition.   Plaintiff Glenn is the personal representative of Zachary's estate, and Plaintiff Zachary is Zachary's widow.

Defendant Boren, a white male, is, and was during the relevant timeframe, the police chief of Columbus.   During the relevant timeframe, Defendant Bolen was the Columbus Police Department's ("CPD") assistant coordinator for in-service training.   Defendant Hudson, a white male, is, and was during the relevant timeframe, a CPD sergeant.   Defendant Coats is, and was during the relevant timeframe, a CPD officer.   Defendant Touchberry is, and was during the relevant timeframe, a CPD sergeant.

Plaintiffs bring official and individual capacity claims against Boren, Bolen and Hudson.   The official capacity claims are considered claims against Columbus.   *See Smith v. Allen*, 502 F.3d 1255, 1272-73 (11th Cir. 2007) (official capacity suit is another way of pleading an action against the entity of which an officer is an agent).   Plaintiffs' claims against Coats and Touchberry are individual capacity claims.

## II.  Zachary Calls the VA and the VA Calls Columbus 911

A little after 3:00 a.m. on April 4, 2005, CPD 911 call taker Ashley Joiner received a call from a nurse at a Veterans Affairs

("VA") Medical Center in Ohio.   The VA nurse told Joiner that a Columbus man, Zachary, had called in a plea for help:

> He called, he was extremely upset, that nightmares woke him up, nightmares of killing kids.  He was raving.  He has slurred speech.  He was talking about the kids he killed.  He was manic, unable to focus.  Just totally whacked out.  And he refuses to go to the V.A. Emergency Room because he hates hospitals. Anyway, somebody's got to go out there.  And, he does have guns, and presume that they're loaded.[3]

(Ex. F. to McDaniel Dep. at 1, Jan. 8, 2008, 911 Tr., Apr. 4, 2005 [hereinafter 911 Tr.].)[4]   The nurse told Joiner that Zachary was "totally crazy" and that he had "a bunch of loaded guns in the house."  (*Id.*)  The nurse gave Joiner Zachary's telephone number and address, 2420 Gould Street in Columbus.  Joiner typed the information she received from the VA nurse into CPD's dispatch computer system, which could be accessed by other CPD 911 workers, including 911 shift supervisor Frances McDaniel.  Joiner's initial comments stated that Zachary was contemplating suicide, although the statement was later retracted and changed to "psychiatric."  (McDaniel Dep. 22:8-23:18.) Joiner's initial comments also stated that Zachary had guns in his house.  (*Id.* 24:3-13.)  McDaniel relayed the information provided by Joiner to CPD officers.

---

[3]Plaintiffs contend that Zachary never told the VA nurse he had guns, but Plaintiffs offer no evidence in support of this contention.

[4]Plaintiffs object to Defendants' use of the 911 Transcript, arguing that it is hearsay and that it has not been properly authenticated.  The Court rejects these arguments.  Defendants produced evidence that the 911 tape was transcribed to the best of the transcriptionist's ability and that CPD kept the 911 Transcript in the ordinary course of business. (Gasaway Aff. ¶¶ 4-5, Sept. 4, 2008; Rowe Aff. ¶ 3, Sept. 12, 2008.)

### III. Dispatch of Columbus Officers to Zachary's House

CPD dispatchers sent a fire engine, an ambulance and two police units to Zachary's location, 2420 Gould Street in Columbus.  In addition, Officer Seth Graham, who was not officially dispatched, responded to dispatch to say he was close to the house, and he went over to the house.  McDaniel, who dispatched the police officers, stated over the police radio[5] that it was a psychiatric problem and that the caller had dreams of "seventy one hundred," which means homicide.  McDaniel told the officers that Zachary had a gun in the residence.  (911 Tr. 5.)  McDaniel ran a computer history on Zachary, and she found one Lester Zachary in the system.  The report gave Zachary's birth date and stated that Zachary was a black male.  It also came back with a caution highlight, meaning that Zachary was dangerous.[6]  (*E.g.*, McDaniel Dep. 26:15-23.)  McDaniel ran a computer history on the Gould Street address and found that someone named Lester had called 911 in February 2008 regarding domestic violence with a weapon.  (*Id.* 33:1-25.)  McDaniel stated over the police radio that there was a Lester Zachary in the system and that the report said he was dangerous.  (911 Tr. 17.)

---

[5]All of the officers responding to the scene had access to the police radio communications.

[6]Plaintiffs contend that the report does not show that Zachary was dangerous, but it is undisputed that McDaniel told the police officers over the radio that Zachary was dangerous.  (*See* 911 Tr. 17.)

## IV.   911 Communication with Zachary

Joiner, the 911 call taker, contacted Zachary by telephone at 3:15, using the number the VA nurse gave her as Zachary's number. (*Id.* at 5.)  Joiner told Zachary that she was calling from 911 and that she had received a call from the VA nurse.  Zachary acknowledged that he had spoken with the VA nurse and told Joiner that he was still alive, that the dreams were back and that he did not want to talk to 911 about it.  (*Id.* at 5-6.)  He hung up the telephone.  At 3:17, McDaniel contacted Zachary by telephone.  Zachary said "Look here, ma'am.  You tell these guys in front my door, I'm . . . I'm going to start shooting.  I'll start shooting . . . get these guys out from my door, man."[7]  (*Id.* at 7.)  McDaniel called Officer Graham, whom she believed to be closest to the scene, to tell him to stand back because Zachary was threatening to shoot.  (*Id.* at 8.)  She also announced over the police radio that Zachary was threatening to shoot if the responders did not move away.  (*Id.* at 9; Graham Dep. 40:25-41:7, Jan. 18, 2008.)  While he was on his way over to the scene, Hudson heard McDaniel say that Zachary was threatening to shoot if

---

[7]Plaintiffs contend that Zachary never said anything about shooting anyone, citing the unsworn police statement of Helen Stephens, who was with Zachary on the night of the incident and did not hear him say such things. (Ex. 5 to Pls.' Statement of Disputed Material Facts at 21, Helen Stephens Statement, Apr. 13, 2005 [hereinafter Stephens Statement].) However, Stephens also stated that she was not in the same room as Zachary during the entire incident. (*Id.* at 17-18.)   When asked about the incident under oath, Stephens did not recall anything about the evening in question—not the shooting, not the police coming to the house, not the 911 calls. (Stephens Dep. 37:6-24; 38:25-39:25, Feb. 20, 2008.)  In any event, it is undisputed that McDaniel told CPD officers over the police radio that Zachary threatened to start shooting. (911 Tr. 8.)

officers did not leave his property.  (Hudson Dep. 103:2-6, Jan. 8, 2008.)

At 3:29, McDaniel called Zachary and asked for "Lester," and Zachary said, "yes sir."  (911 Tr. 20.)  McDaniel, referred to Zachary by his first name, Lester, several other times during the conversation.  McDaniel asked Zachary what was wrong.  Zachary replied, "Nothing wrong, baby.  Nothing wrong, I'm fine."  McDaniel, who had learned that the telephone was registered to Helen Stephens, asked if Stephens was there.  When Zachary replied that she was, McDaniel asked to speak with her.  Zachary initially refused but then put Stephens on the phone.  Stephens told McDaniel that she was Zachary's wife, that Zachary was okay and that Zachary did not have a gun.  Stephens also said she was not feeling threatened, that she would put up the dog, which was chained to the porch, and that she would open the door for police.  At 3:30, McDaniel stated over the police radio that she had made contact with Zachary's wife, that the wife said there was no gun in the house, that Zachary had calmed, and that the wife would open the door for the officers.

**V.   The Stand-Off**

While 911 was communicating with Zachary and Stephens, Hudson arrived at 2420 Gould Street, established a perimeter and attempted to start a dialogue with Zachary.  At least eight officers, including Coats and Touchberry, responded to the scene.  Zachary came out on the open front porch at 3:31 but then went back inside.  Zachary came

9

out on the porch again at 3:32, waving his hands in the air and pacing on the porch.  He lifted up his shirt and told officers that he did not have a gun.  Zachary repeatedly told the officers that he had done nothing wrong and to get off his property, and he told them several times that he did not have a gun, although some of the officers testified that Zachary was also "ranting and raving incoherently." (*E.g.*, Hudson Dep. 120:15-17.)  It is undisputed that Zachary did not yell any threats at the officers on the scene and that the officers on the scene did not see a weapon in Zachary's hands.  The officers did, however, suspect that a gun could be hidden somewhere on the porch or just inside the front door.   It is undisputed that a large dog remained chained on the porch and that no officers attempted to go up on the porch.  According to Hudson, Zachary said that the dog would bite.   (Hudson Dep. 119:1-3.) Zachary never set the dog on the officers or moved to unchain the dog, although he was at times close to the dog.

Stephens came down from the porch to speak with Hudson. Stephens told Hudson that Zachary had been drinking but that everything was all right, that there were no weapons in the house, and that she did not feel threatened.  She also told Hudson that there was a fourteen-year-old in the back bedroom of the house.[8] (Hudson Dep. 135:24-25.)  Hudson did not believe Stephens when she

---

[8]Plaintiffs argue that Stephens never said anything about a child being in the house, citing Stephens's unsworn police statement.  However, even in that statement, Stephens stated that she told officers that Zachary was not "threatening the baby."  (Stephens Statement 21.)

said that she was not in danger.  (Hudson Dep. 135:4-20.)  Hudson relayed the substance of this conversation over the police radio and told Touchberry about the conversation.  At 3:33, Hudson called back to 911 over the police radio and asked McDaniel exactly what Zachary had said to the VA nurse, and McDaniel reported that Zachary told the VA nurse that "he was having dreams of killing children, and that he has . . . [a] gun in the home."  (911 Tr. 26.)  Hudson responded over the radio that the wife said there was no gun, that she did not feel threatened and that she had not heard Zachary make any threats. Hudson then asked McDaniel whether Zachary told her he was going to start shooting, and McDaniel replied that he had.  (*Id.*)

At 3:37, both Zachary and Stephens were on the porch.  Zachary yelled out to the officers that "this is over with" and that he was going to bed.  Zachary held Stephens by her upper arm and "ushered" her back into the house and shut the door.  There is no evidence in the present record that the officers ordered Zachary to come down from the porch or that Zachary disobeyed an order from the officers.

## VI.  The Shooting

Hudson and Touchberry conferred and decided to use a beanbag munition.[9]  Hudson told Coats that if Zachary came out of the house

_____

[9]According to Hudson, he and Touchberry decided to use the beanbag munition because they were concerned that Zachary would harm Stephens or the child.  According to Coats, Hudson and Touchberry said not to let Zachary back in the house because they were not sure if he would come out again.  (Coats Dep. 178:11-16, Mar. 28, 2008.)  They did not discuss an alternative to the beanbag munition, such as pepper spray.

again, he should deploy a beanbag munition at Zachary.[10]  A beanbag munition is a small cloth sack sewn shut around lead pellets, with sections of the sack made into small trailers that cause the beanbag to fly in a stabilized trajectory.  CPD deploys beanbag munitions using a Remington 870 shotgun.  Touchberry instructed Coats where to position himself.  Neither Touchberry nor Hudson gave Coats a specific instruction regarding where on Zachary's body to aim the beanbag munition.

Hudson and Touchberry called for Zachary to come back out of the house.  Zachary came out onto the porch at approximately 3:41, and Coats was positioned about 20 or 21 feet from Zachary.  Hudson and Touchberry called out for Coats to take a shot.  Zachary's lower body was obscured by the porch railing.  According to Coats, he targeted Zachary's left shoulder blade.  However, the shot hit Zachary in the spleen area.[11]  Zachary fell down onto a couch on the porch, but he tried to get up.  Coats took another shot and hit Zachary in the upper left chest.  Zachary fell to the floor and stayed down.

---

[10]Plaintiffs contend that Coats failed his shooting exercises and thus should not have been the one to deploy the beanbag munition.  However, Defendants presented unrebutted evidence that Coats scored well on all of his shooting exercises.  (Bolen Aff. ¶¶ 6-7 & Ex. 1, Sept. 15, 2008.)

[11]Coats contends that Zachary moved, so even though Coats aimed for the shoulder blade he hit the spleen area.

## VII. The Aftermath

After the second shot, Hudson and Touchberry scaled over the porch railing and took Zachary into custody.  Zachary, who did not appear to be bleeding externally and was able to walk on his own, was handcuffed and taken to the hospital in a squad car.  Zachary was charged with making terroristic threats in violation of O.C.G.A. § 16-11-37, based on his statements to the 911 operator that he would start shooting if the responders did not leave his property. Defendants do not appear to dispute that the arresting officers did not have personal knowledge of the conversations between Zachary and the VA nurse or Zachary and CPD 911 personnel.  Defendants do not dispute that the officers did not obtain a warrant before deploying the beanbag munition.  It is undisputed that Boren did not know about the shooting until several hours after it occurred.

Zachary died at the hospital on April 6, 2005.  A Georgia Bureau of Investigation medical examiner conducted an autopsy and concluded that the cause of Zachary's death was "internal bleeding due to blunt force trauma of the spleen due to impact from a beanbag (fired from a gun)."  (Ex. 2 to Lehman Dep., Mar. 25, 2008, Autopsy Official Report 6.)  The medical examiner also found that one of Zachary's ribs was broken and that Zachary had abrasions where the beanbags hit him.

Hudson and his supervisor, Lt. Gordon Griswould, prepared a use of force report documenting the April 4 shooting.  The CPD Office of

13

Professional Standards ("OOPS") investigated the shooting.  Hudson and Coats were placed on administrative leave pending the outcome of the investigation.  Following the investigation, OOPS submitted a report of the incident to Chief Boren, recommending that the officers be exonerated.

## VIII.    CPD Policies

### A.    CPD Use of Force Policy

According to CPD policy, officers should use only the minimum force necessary to perform their duties effectively.  CPD has a "Force Continuum" that "provides a series of responses which are available for officers when confronting a subject." (Ex. 2 to Boren Dep., Apr. 21, 2008, CPD General Order on Non-Deadly Force/Less Lethal Munitions § 3-1.7.)  The force continuum ranges from Level One, "Officer Presence," to Level Seven, "Deadly Force."  The use of less lethal munitions is Level Six, one step below deadly force. (*Id.*)  Officers are directed to consider the totality of the circumstances in determining how to respond to a situation, including the age, sex, size, skill level and number of officers and/or subjects.  The officers should also evaluate additional factors, including proximity to a firearm, ground position and imminent danger.

According to CPD policy, "less lethal munitions," including the beanbag munition "are designed to incapacitate hostile subjects without causing death or serious injury." (Ex. 6 to Bolen Dep. 5,

14

Feb. 21, 2008, CPD Order on Less Lethal Munitions § 3-1.9 ¶ A [hereinafter CPD LLM Order].)  The policy notes that the use of less lethal munitions "may result in serious injury and/or death even when properly deployed."  (*Id.*)  Only officers who have trained and qualified with less lethal munitions may deploy them.  The policy provides that situations that may be suitable for deployment of less lethal munitions include "subjects who are armed with a knife or similar weapon where there is not an immediate threat to the officer or a third person" and "persons who may be armed with a knife, firearm, or other weapon who may attempt to force an officer into using deadly force in order to achieve their suicide." (*Id.* at 8 ¶ D.)

B.   CPD "Less Lethal Munitions" Training

Bolen created CPD's "Less Lethal Munitions" training regarding the beanbag munition.  To prepare for this job, Bolen attended a Specialty Impact Munitions Instructor Training Course at Armor Holdings ("Armor"), where he received training materials on how to structure and develop policies and guidelines for beanbag munitions. These Armor materials provided guidelines and recommendations concerning the distance and targeting of the beanbag munition, based upon Armor's research.  Bolen was certified as an instructor to train officers on use of the beanbag munitions.[12]

---

[12]Bolen's certification expired on February 28, 2002.  He was not recertified until May 6, 2005.

Bolen's training program was released in May 2001.  The training stated that "extreme caution" should be exercised at distances of less than ten feet "due to the high possibility of a fatal outcome." (CPD LLM Order 3.)  The training also stated that at distances of ten to twenty feet, officers should "avoid the head, neck, spleen, liver, and kidney areas," although the training did not include any explanation of where the liver, spleen and kidneys are located. (*Id.*)  The training further provided that at distances of twenty to forty feet, "the target area should be the center mass."[13] (*Id.*)  In contrast, the Armor Holdings 2003 Specification Manual[14] recommends that at distances of ten to twenty feet and twenty to thirty feet officers should target "lower extremities *unless deadly force is warranted*."  (Ex. 10 to Bolen Dep. 6, 2003 Armor Holdings Specification Manual [hereinafter 2003 Armor Manual] (emphasis added).)  The Armor training materials Bolen received in 2000 did state that while the buttocks and thigh were the primary target areas, secondary target areas included muscle areas, including the shoulder, biceps, triceps and forearm area.  (Ex. 1 to Bolen Aff. 15,

---

[13]Later in the CPD training, there is a section called "aiming point," which instructs officers, "The closer you are, the lower the aiming point."  (CPD LLM Order 10.)  The training warns to avoid the head, neck, spine, groin and life supporting organs "unless it is the intent to deliver deadly force."  (*Id.*)  Finally, the training notes that "[s]hots to the 'center mass' provide for the highest probability of serious injury or death."  (*Id.*)

[14]Again, Bolen's Armor Holdings certification expired on February 28, 2002.  He was not recertified until May 6, 2005.  Bolen did not update the CPD training materials during the time when his certification had lapsed.

July 9, 2008, 2000 Armor Holdings Manual [hereinafter 2000 Armor Manual].)  Still, the Armor training emphasizes that life supporting organs susceptible to damage from impact "should be AVOIDED unless it is the intent to deliver deadly force."  (*Id.* at 16.)  The Armor training further states that the center mass is a "last resort" target area and should be used "to meet a level of threat escalating to deadly force justification."  (*Id.* at 15.)  The Armor training also states that shots to the center mass "have the highest potential to cause serious injury or death."  (*Id.* at 16.)

## IX.  Plaintiffs' Claims

Plaintiffs bring the following claims: (1) § 1983 claim against Defendants for unreasonable seizure in violation of the Fourth Amendment (3d Am. Compl. ¶¶ 49-55 [hereinafter Compl.]); (2) § 1983 claim against Defendants for excessive force in violation of the Fourth Amendment (*Id.*); (3) substantive due process claim against Defendants (*Id.* ¶¶ 56-67); (4) civil conspiracy claim against Coats, Hudson and Touchberry (*Id.* ¶¶ 68-78); (5) First Amendment claim against Defendants (*Id.* ¶¶ 79-88); (6) equal protection claim against all Defendants except Bolen (*Id.* ¶¶ 89-96); (7) assault and battery claim against Coats, Hudson and Touchberry (*Id.* ¶¶ 97-100); (8) "intentional tort" and "malicious negligence" claim against Defendants (*Id.* ¶¶ 101-103); (9) false arrest claim against Coats, Hudson and Touchberry (*Id.* ¶¶ 107-109); (10) false imprisonment claim against Boren, Coats, Hudson and Touchberry (*Id.* ¶¶ 110-112); and

17

(11) intentional infliction of emotional distress claim against Coats, Hudson and Touchberry (*Id.* ¶¶ 113-118).

DISCUSSION

## I.   § 1983 Fourth Amendment Claims

To prevail on a § 1983 claim, Plaintiffs must prove that Defendants, acting under color of state law, deprived Zachary of a right, privilege, or immunity secured by the Constitution or a federal law.  *See* 42 U.S.C. § 1983.  It is undisputed that the officers acted under color of state law during the April 4, 2005 incident.  Plaintiffs contends that the officers violated Zachary's Fourth Amendment rights to be free from unreasonable search and seizure and from the use of excessive force.

### A.   § 1983 Standards

Plaintiffs make their § 1983 Fourth Amendment claims against the individual officers who were on the scene, against the supervising and training officers, and against Columbus.  Because the different classes of defendants assert different defenses, the Court will briefly examine the basic principles of each defense.

#### 1.   *Individual Capacity Claims and Qualified Immunity*

Plaintiffs' individual capacity claims against Hudson, Coats and Touchberry are based upon their direct involvement in the April 4, 2005 incident.  Plaintiffs' individual capacity claims against Boren and Bolen, who were not on the scene, are based upon a theory of supervisory liability, discussed more fully below.  All of these

18

individual defendants contend that they are entitled to qualified immunity.

Qualified immunity shields public officers acting within the scope of their discretionary authority from liability so long as their acts do not violate clearly established law. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation . . . protecting from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)).

To receive qualified immunity, an officer must show that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*, 284 F.3d at 1194 (internal quotation marks omitted). Here, Plaintiffs do not appear to dispute that the officers were acting within their discretionary authority during the events giving rise to this action. Therefore, Plaintiffs must meet their burden to show that qualified immunity is not appropriate. *See id.* To meet this burden, Plaintiffs must first show that, taken in the light most favorable to Plaintiffs, the facts show that the officers' conduct violated a constitutional right. *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008) (citing

*Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  If Plaintiffs do not make this showing, there is no need for further inquiry.  *See Lee*, 284 F.3d at 1194.  If the facts viewed in the light most favorable to Plaintiffs *do* establish a violation of a constitutional right, the Court must determine if the right was clearly established at the time of the officers' conduct.  *Hadley*, 526 F.3d at 1329 (citing *Saucier*, 533 U.S. at 201).  A right is clearly established if it is "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Hope*, 536 U.S. at 739 (internal quotation marks omitted); *accord Saucier*, 533 U.S. at 202. The unlawfulness of the action must be apparent in light of pre-existing law, but the very action in question need not have been previously held unlawful.  *Hope*, 536 U.S. at 739.

Since qualified immunity provides an immunity from suit, qualified immunity questions should be resolved at the earliest possible stage in litigation.  *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987).  However, the protection of qualified immunity is only warranted at the summary judgment stage if the defendant officers can "establish that there is no genuine issue of material fact preventing them from being entitled to qualified immunity." *Johnson v. Breeden,* 280 F.3d 1308, 1317 (11th Cir. 2002).  "[I]f the evidence at the summary judgment stage, viewed in the light most favorable to the plaintiff, shows there are facts that are

inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it will proceed to trial."  *Id.*

    2.    *Supervisory Liability*

    As to Plaintiffs' claims against the supervisors, supervisory officials may not be held liable under § 1983 on the basis of respondeat superior or vicarious liability.  *Danley v. Allen*, 540 F.3d 1298, 1314 (11th Cir. 2008).  Rather, supervisory liability under § 1983 occurs "either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation."  *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).  A causal connection "can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so."   *Id.* (internal quotation marks omitted).   "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."  *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990).  A plaintiff can also establish a causal connection by showing that the facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."  *Cottone*, 326 F.3d at 1360 (internal quotation marks omitted).

### 3.   Municipal Liability

Regarding Plaintiffs' claims against Columbus, Plaintiffs must show that Zachary suffered a constitutional violation as a result of the City's unlawful "policy or custom." *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1145 (11th Cir. 2007); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  "'A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. . . .  A custom is a practice that is so settled and permanent that it takes on the force of law.'" *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (quoting *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997)).  Only "those officials who have final policymaking authority may render the municipality liable under Section 1983." *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999) (per curiam) (internal quotation marks and emphasis omitted).  Final policymaking authority may be delegated, but for the municipality to be liable under a delegation theory "the delegation must be such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review." *Id.*

### B.   § 1983 Unreasonable Seizure Claim

Plaintiffs' first claim is that the officers violated the Fourth Amendment by arresting Zachary for violating Georgia's terroristic

threats statute without probable cause.[15]   The Fourth Amendment gives individuals the right to be free from "unreasonable searches and seizures."   There is no dispute in this case that Zachary was "seized" within the meaning of the Fourth Amendment when he was shot with the beanbag munition, then arrested.   The reasonableness of an arrest is "determined by the presence or absence of probable cause for the arrest." *Skop*, 485 F.3d at 1137.   "'Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime.'" *Id.* (quoting *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam)).   "This probable cause standard is practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances." *Id.* (citing *Maryland v. Pringle*, 540 U.S. 366, 370 (2003)).

With regard to the individual capacity claims against the arresting officers—Hudson, Coats and Touchberry—the relevant question

---

[15]Plaintiffs also contend that the officers violated the Fourth Amendment by arresting Zachary without a warrant, citing authority regarding arrests made *inside* a suspect's home.   While arrests inside a person's home may not, under the Fourth Amendment, be made without a warrant or exigent circumstances, *see Payton v. New York*, 445 U.S. 573, 590 (1980), it is undisputed that Zachary was on the front porch, not inside the home, when he was shot with the beanbag munition and arrested, so the in-home arrest line of cases does not apply. *See United States v. Watson*, 273 F.3d 599, 602 n.2 (5th Cir. 2001) ("An arrest on a porch is not considered 'inside' the house for purposes of determining its constitutionality under the Fourth Amendment."); *see also Payton*, 445 U.S. at 590 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.").

for qualified immunity purposes is not whether the officers had probable cause but whether they had arguable probable cause to arrest Zachary. "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[s] could have believed that probable cause existed to arrest." *Lee*, 284 F.3d at 1195 (internal quotation marks omitted). "This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who *unreasonably* conclude that probable cause exists." *Skop*, 485 F.3d at 1137.

Whether an arresting officer possesses probable cause (or arguable probable cause) "depends on the elements of the alleged crime and the operative fact pattern." *Id.* at 1137-38 (internal citation omitted). Here, the officers contend that they had probable cause to arrest Zachary for making terroristic threats in violation of O.C.G.A. § 16-11-37(a), which provides: "A person commits the offense of a terroristic threat when he or she threatens to commit any crime of violence . . . with the purpose of terrorizing another . . . or in reckless disregard of the risk of causing such terror . . . ." The crime of terroristic threats "is completed when the threat is communicated to the victim with the intent to terrorize." *Armour v. State*, 265 Ga. App. 569, 571, 594 S.E.2d 765, 767 (2004). The message need not be directly communicated to the victim if the threat is made "in such a way as to support the inference that the

speaker intended or expected it to be conveyed to the victim." *Id.* (emphasis omitted); *cf. Richards v. State*, 286 Ga. App. 580, 582, 649 S.E.2d 757, 750-51 (2007) (finding valid search of home based on police dispatcher's report of a 911 call regarding a child being beaten and officers' on-the-scene corroboration with neighbors who said a child was being beaten—despite occupants' insistence that there was no child in the home).

As a preliminary matter, Plaintiffs dispute that Zachary was the person who made threats over the telephone to the 911 dispatcher. However, the officers on the scene reasonably concluded that Zachary was the same person who told McDaniel he would start shooting the responders in front of his house. When the officers arrived on the scene at the address the VA nurse gave as Zachary's address, the set of facts before them was congruent with the information being provided to them by McDaniel over the police radio.[16] Zachary matched the description McDaniel had given the officers based on McDaniel's computer search. The officers observed Zachary go in and out of the house, yell at them and, according to some officers, rant and rave incoherently. This, combined with the presence of Helen Stephens and

_____

[16]McDaniel reasonably concluded that it was Lester Zachary who had made the threat to start shooting. Joiner and McDaniel both called the telephone number given to them by the VA nurse as Zachary's number, and the male who answered acknowledged speaking with the nurse and said that the nightmares were back. (911 Tr. 6.) When McDaniel asked for Lester, the male who answered said, "Yes, sir" and did not correct McDaniel when she referred to him as Lester. (*Id.* at 20.) The male also confirmed that police were outside his house at the address the VA nurse had given to Joiner as Zachary's address. (*Id.* at 21-22.)

the dog chained to the porch, reasonably led the officers on the scene to conclude that Zachary was the same person who had been speaking with McDaniel, Joiner and the VA nurse.

The next question is whether a reasonable officer on the scene and possessing the same knowledge as Hudson, Coats and Touchberry could have reasonably believed that Zachary had made a terroristic threat. Based on McDaniel's communications, the officers knew that (1) when McDaniel contacted Zachary by telephone, Zachary told her to let the responders in front of his door know that he would start shooting them if they did not move away, (2) Zachary was having dreams of killing people, (3) Zachary may have a loaded gun inside the house, and (4) the computer report flagged Zachary as "dangerous." As discussed above, based on their own observations at the scene, the officers reasonably believed that Zachary was the same person who had threatened to start shooting the responders. Although Zachary made no threats directly to the officers and told the officers that he did not have a weapon, the crime of terroristic threats was completed when the threat was communicated to the officers, *see Armour*, 265 Ga. App. at 571, 594 S.E.2d at 767, and it was reasonable for McDaniel and the officers to construe Zachary's statements to McDaniel as a threat to inflict harm upon the

responders standing outside of Zachary's house if those responders did not leave.[17]

Based on all of this, the Court concludes that Hudson, Coats and Touchberry had at least arguable probable cause to arrest Zachary for making a terroristic threat. Therefore, Hudson, Coats and Touchberry are entitled to summary judgment based on qualified immunity as to Plaintiffs' Fourth Amendment unreasonable seizure claim. Furthermore, Plaintiffs have pointed to no basis for holding Boren or Bolen individually liable. Even if the officers on the scene did not have probable cause to arrest Zachary, it is undisputed that neither Boren nor Bolen was on the scene, and Plaintiffs have pointed to no causal connection between their actions and the officers' decision to arrest Zachary for making a terroristic threat. Accordingly, Boren and Bolen are entitled to summary judgment based on qualified immunity as to Plaintiffs' Fourth Amendment unreasonable seizure claim. Finally, Columbus is entitled to summary judgment on Plaintiffs' Fourth Amendment unreasonable seizure claim because Plaintiffs have pointed the Court to no policy or custom that was the moving force behind the officers' decision to arrest Zachary for making a terroristic threat.

---

[17]Plaintiffs also contend that Zachary was justified in making the threat under O.C.G.A. § 16-3-23, which permits a person to use the threat of force to prevent *unlawful* entry or attack on a habitation. Since the officers had at least arguable probable cause to arrest Zachary for making a terroristic threat, their presence at the scene was not unlawful, and Zachary was therefore not justified in making the threat.

C.   § 1983 Excessive Force Claim

1.   *Liability of Officers Hudson, Coats and Touchberry*

Plaintiffs also contend that the officers used excessive force when they shot Zachary with the beanbag munition.  This claim must be analyzed under the Fourth Amendment's objective reasonableness standard.  *Jackson v. Sauls*, 206 F.3d 1156, 1169 (11th Cir. 2000) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  The right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham*, 490 U.S. at 396.  The use of force must be judged on a case-by-case basis "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*  Defendants do not seriously dispute that there is at least a fact question that shooting Zachary with the beanbag munition in the upper torso, hitting him in the spleen area, constituted deadly force.[18]  It is clear that a beanbag munition can be used as deadly or non-deadly force, depending on the shooter's distance from the subject and where the subject is hit.  Here, based on Coats's distance from Zachary and the fact that Coats targeted Zachary's upper body, hitting Zachary in the spleen area, a jury could conclude that Coats used deadly force.

_____

[18]Coats contends that he did not intend to hit Zachary in the spleen. However, Coats *did* hit Zachary in the spleen, creating a jury question as to whether he intended to do so.  In any event, it is undisputed that Coats aimed at Zachary's upper body from a distance of 20 or 21 feet, though Armor's training materials advise that from that distance only lower extremities should be targeted unless deadly force is warranted. (2003 Armor Manual 6.)

28

Furthermore, a jury could conclude that Hudson and Touchberry ordered Coats to use deadly force because although neither Hudson nor Touchberry told Coats *where* to shoot Zachary, they did order him to shoot Zachary with the beanbag munition, and they did tell Coats where to stand so that he would be within 20-25 feet of the porch and at a vantage point that required Coats to target Zachary's upper body because Zachary's lower extremities were obscured by the porch railing.  Therefore, the key question is whether the officers had probable cause to use deadly force.

Deadly force is "'not constitutionally unreasonable to prevent escape'" where "'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[.]'"  *Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).  Therefore, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."  *Garner*, 471 U.S. at 11-12.[19]  In contrast, "[a] police officer may not seize an

---

[19]The Court recognizes that *Garner* "did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force,'" *Scott v. Harris*, 550 U.S. 372, ___, 127 S. Ct. 1769, 1777 (2007), but *Garner* does supply a Fourth Amendment "reasonableness" test that the Court finds is appropriate for analyzing the particular type of force used in the particular situation confronting the officers in this action.

unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11.

Here, viewing the facts in the light most favorable to Plaintiffs as the Court must do in analyzing a motion for summary judgment, the Court concludes that the officers' use of force was not objectively reasonable under the Fourth Amendment. It is true that the officers were aware that Zachary had told either the VA nurse or 911 that he had guns, and they were aware that he told McDaniel that he would start shooting if the responders did not leave. That information is mitigated, however, by a number of other facts collected by the officers during the twenty or so minutes they were on the scene after the telephonic threat to McDaniel but before the shooting. Zachary never made any threats directly to the officers, and he never threatened Stephens or anyone else in front of the officers. None of the eight officers on the scene saw a weapon in Zachary's hands or on his person. The officers knew that Zachary was a "psychiatric" case. Zachary repeatedly told the officers he had no weapons, and he lifted his shirt to show them that there was no weapon in his waistband. Stephens told both 911 and the officers on the scene that she did not feel threatened, that Zachary did not have a gun, and that Zachary had calmed. Zachary came out onto the porch at least three times. Each time, Zachary went back into the house, but each time, he returned to the porch unarmed and telling officers that he was unarmed. Before he went into the house for the last time,

Zachary told the officers he was going to bed.  After that, Zachary complied with the officers' requests for him to come back outside, and Zachary was still unarmed.

Weighing all of these facts, a jury could conclude that a reasonable officer on the scene possessing the same facts as Coats, Hudson and Touchberry would not have had a reasonable belief that deadly force was warranted under the circumstances.  Zachary was intoxicated and loud, but he did not directly threaten the officers, and the officers never saw a weapon in Zachary's hands or on his person during their twenty or so minutes on the scene before the shooting.  Furthermore, the officers' own actions—deploying a beanbag munition instead of shooting Zachary with a lethal munition—suggest that the officers on the scene actually did not believe deadly force was warranted.  The officers contend that they did not intend to kill Zachary; the CPD use of force continuum categorizes the beanbag munition as non-deadly force; and the officers were trained that the beanbag munition is "designed to incapacitate hostile subjects without causing death or serious injury."  (CPD LLM Order 5.)

For all of these reasons, the Court finds that genuine issues of material fact exist as to whether Hudson, Coats and Touchberry had arguable probable cause to use deadly force against Zachary.  The Court further finds that the law at the time of the shooting clearly established that deadly force is not permitted unless the officers have probable cause to use deadly force.  *See Garner*, 471 U.S. at 11-

31

12.  Therefore, the Court cannot decide at this stage whether Hudson, Coats and Touchberry are entitled to qualified immunity because certain fact issues must be decided by a jury.  *See Breeden*, 280 F.3d at 1317 ("[I]f the evidence at the summary judgment stage, viewed in the light most favorable to the plaintiff, shows there are facts that are inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it will proceed to trial.").  The Court emphasizes that it has *not* found that the officers are not entitled to qualified immunity.  The jury may well find that Plaintiffs' version of the facts is not true and that the officers did have arguable probable cause to use deadly force.  In that case, the officers will be entitled to qualified immunity.  However, because genuine issues of material fact exist, that determination is premature and cannot be made based upon the pretrial record.

> 2.    *Columbus Liability*

Plaintiffs contend that the officers used excessive force against Zachary because the City failed to train the officers properly on the use of the beanbag munition.  "A failure to adequately train municipal employees constitutes an actionable policy or custom for § 1983 purposes 'only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact.'"  *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1116 (11th Cir. 2005) (alteration in original) (quoting *City of Canton, Ohio v.*

*Harris*, 489 U.S. 378, 388 (1989)).  Here, Plaintiffs point to the CPD's written "Less Lethal Munitions" training program as evidence of the policy of failing to train officers adequately on the beanbag munition.  CPD delegated the task of creating the "Less Lethal Munitions" training to Bolen, and though the "Less Lethal Munitions" training had to fit within CPD's Use of Force policy, the "Less Lethal Munitions" training was based on Bolen's own research, consisting chiefly of Armor's Specialty Impact Munitions Instructor Training Course.  There is no evidence in the present record that anyone above Bolen in the chain of command reviewed the training program or made substantive changes to it.  Based on the present record, the facts viewed in the light most favorable to Plaintiff suggest that Bolen was the City's final policymaker for purposes of formulating the "Less Lethal Munitions" training.  *See Brown*, 188 F.3d at 1290 (discussing delegation of final policymaking authority).  Even if Bolen were not the City's final policymaker and the "Less Lethal Munitions" training is not an officially adopted City policy, the fact that it is the written, official basis for CPD's training on the beanbag munition suggests that it is at least a "practice that is so settled and permanent that it takes on the force of law." *Cooper*, 403 F.3d at 1221 (internal quotation marks omitted).

Having found that a jury could conclude that the "Less Lethal Munitions" training constitutes the City's policy or custom regarding use of the beanbag munition, the Court next considers whether the

33

training amounts to deliberate indifference to the rights of persons with whom the officers using the beanbag munition come into contact. To establish deliberate indifference, Plaintiffs must show that Columbus had subjective knowledge of a risk of serious harm but disregarded that risk by conduct that is more than mere negligence. *Cook*, 402 F.3d at 1115.   Here, Columbus knew—because the person Columbus delegated to develop the "Less Lethal Munitions" training knew, based on the Armor training Bolen received—that death was a serious risk of shooting a suspect in the spleen or center mass, even from distances greater than twenty feet. (*See* 2000 Armor Manual 16 (noting that impact to life supporting organs "should be AVOIDED unless it is the intent to deliver deadly force" and that shots to the center mass "have the highest potential to cause serious injury or death"); *see also* 2003 Armor Manual 6 (recommending that at distances of ten to thirty feet officers should target "lower extremities unless deadly force is warranted").[20])   Therefore, Columbus knew that officers should not deploy a beanbag munition toward a suspect's spleen or center mass from a distance less than thirty feet unless deadly force was authorized.   Accordingly,

---

[20]It is undisputed that Bolen did not have the 2003 Specification Manual when he created the CPD "Less Lethal Munitions" training.  It is also undisputed that Bolen did not attend any re-certification training or update the CPD "Less Lethal Munitions" training between the time his Armor training certification expired and 2002 and when he renewed it in May of 2005.  Even ignoring the 2003 manual's admonition to target lower extremities unless deadly force is warranted, the 2000 manual clearly informed Bolen of the substantial risk of death if officers were to target a life supporting organ or the center mass with a beanbag munition.

Columbus had an obligation to reasonably assure that its police officers did not shoot someone in the spleen or center mass if deadly force was not authorized.

Nonetheless, when Bolen created CPD's "Less Lethal Munitions" training, he instructed officers that at distances of twenty to forty feet—the range at issue in this action—"the target area should be the center mass."[21] (CPD LLM Order 3.) The CPD training does not, however, explain that the center mass should only be targeted if deadly force is authorized. This instruction is the *opposite* of Armor's guidelines and recommendations concerning the distance and targeting of the beanbag munition, which are based upon Armor's research. According to Armor, the primary target areas should be the buttocks and thigh; the secondary target areas should be muscle areas such as the shoulder, biceps, triceps and forearm; and the center mass is a "last resort" target area and should be used "to meet a level of threat escalating to deadly force justification." (2000 Armor Manual 15.) Again, the Armor training warned that shots to the center mass "have the highest potential to cause serious injury or death" and that impact to life supporting organs "should be AVOIDED unless it is the intent to deliver deadly force." (*Id.* at 16.) Bolen argues that any discrepancies between his training and the Armor recommendations are inadvertent, but the fact that Bolen's training recommends

_____

[21]Bolen also instructed officers that at distances of ten to twenty feet, officers should "avoid the head, neck, spleen, liver, and kidney areas," but Bolen did not explain where the liver, spleen and kidneys are located so that officers knew which areas to avoid. (CPD LLM Order 3.)

targeting the center mass in spite of Armor's specific admonition to avoid the center mass unless deadly force is authorized gives rise to a jury question on the question whether Bolen, and therefore Columbus, disregarded a risk of serious harm by conduct that is more than mere negligence.  For these reasons, the Court denies the City's motion for summary judgment as to Plaintiffs' Fourth Amendment excessive force claims.

>    3.    *Bolen Individual Liability*

For the same reasons that a jury could conclude that Columbus was aware of the risk of a serious harm associated with deployment of the beanbag munition toward the center mass or spleen but disregarded that risk by conduct that is more than mere negligence, a jury could conclude that Bolen, in creating CPD's "Less Lethal Munitions" training, was deliberately indifferent to the rights of persons with whom the officers using the beanbag munition come into contact.  The Court further finds that a jury could find a causal connection between Bolen's training and Zachary's injury because there is a fact question as to whether Coats targeted the spleen or center mass even though deadly force was not warranted.  As discussed above, at the time of the shooting (and the creation of the training) it was clearly established that deadly force is not permitted unless the officers have probable cause to use deadly force.  *See Garner*, 471 U.S. at 11-12.  For all of these reasons, at this time, qualified immunity is not appropriate as to Plaintiffs' claims against Bolen

because a jury could conclude that he trained officers to aim the beanbag munition at the center mass even when deadly force was not warranted because he told them to target the center mass at distances of twenty to forty feet but did not adequately warn them of the consequences of targeting the center mass from that distance.   The Court therefore denies Bolen's motion for summary judgment as to the excessive force claim against him in his individual capacity.

### 4.   *Boren Individual Liability*

Plaintiffs also seek to hold Chief Boren individually liable for excessive force against Zachary.   It is undisputed that Boren did not participate in the beanbag shooting or in training the officers on the beanbag munition.   Plaintiffs have not pointed to a "history of widespread abuse" that put Boren on notice of the need to correct CPD's "Less Lethal Munitions" policy.   *Cottone*, 326 F.3d at 1360. Plaintiffs have also not pointed to any evidence that Boren instructed his subordinates to act unlawfully or knew that they would act unlawfully and failed to stop them from doing so.   Accordingly, the Court concludes that Plaintiffs have not pointed to sufficient evidence of a causal connection between Boren's actions and Zachary's shooting.   Therefore, Boren is entitled to qualified immunity as to Plaintiffs' excessive force claims against him in his individual capacity.

37

## II.   § 1983 Substantive Due Process Claim

Plaintiffs' substantive due process claim is based upon the same facts underlying their unreasonable seizure and excessive force claims. Accordingly, that claim must be analyzed under the Fourth Amendment's objective reasonableness standard, discussed above, rather than a Fourteenth Amendment substantive due process approach. Therefore, Defendants are entitled to summary judgment on the substantive due process claim. *See, e.g., Reese v. Herbert*, 527 F.3d 1253, 1261 n.11 (11th Cir. 2008).

## III. First Amendment Claim

In addition to their Fourth Amendment claims, Plaintiffs contend that the officers arrested Zachary in retaliation for Zachary's exercise of free speech, thus violating the First Amendment.[22]   To state a retaliation claim, Plaintiffs must show (1) that Zachary's speech was constitutionally protected, (2) that the officers' retaliatory conduct adversely affected the protected speech, and (3) there is a causal connection between the constitutionally protected speech and the retaliatory actions. *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

The First Amendment "'ordinarily' denies a State 'the power to prohibit dissemination of social, economic and political doctrine

---

[22]In their brief, Plaintiffs did not respond to Defendants' arguments in support of summary judgment on the First Amendment Claim. At the motion hearing, Plaintiffs' counsel represented that Plaintiffs had not abandoned their First Amendment claim and that the same arguments Plaintiffs made with regard to the Fourth Amendment unreasonable seizure claim applied to Plaintiffs' First Amendment claim.

which a vast majority of its citizens believes to be false and fraught with evil consequence.'" *Virginia v. Black*, 538 U.S. 343, 358 (2003) (quoting *Whitney v. California*, 274 U.S. 357, 374 (1927) (Brandeis, J., concurring)). However, the First Amendment's protections are not absolute, and "the government may regulate certain categories of expression consistent with the Constitution." *Id.* Therefore, consistent with the Constitution, the government may regulate speech that constitutes a "true threat." *Id.* at 359.

A "true threat" is a statement "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* "The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.'" *Id.* at 359-60 (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)). "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id.* at 360. "A communication is a threat when in its context [it] would have a reasonable tendency to create apprehension that its originator will act according to its tenor." *United States v. Alaboud*, 347 F.3d 1293, 1296 (11th Cir.

2003) (alteration in original and internal quotation marks omitted) (explaining what constitutes a "communication" containing a "threat" under 18 U.S.C. § 875(c)).  Thus, the government may regulate speech if the speaker intentionally makes the statement and a reasonable person would construe the statement as a serious expression of an intent to inflict bodily harm or death.

Here, the Court cannot find that Zachary's statement to the 911 dispatcher was protected speech.  When the 911 dispatcher called Zachary, Zachary said, "Look here, ma'am.  You tell these guys in front my door, I'm . . . I'm going to start shooting.  I'll start shooting . . . get these guys out from my door, man."  (911 Tr. at 7.)  As discussed above, it was reasonable for McDaniel and the officers to construe Zachary's statements as a threat to inflict harm upon the responders standing outside of Zachary's house if those responders did not leave.  Therefore, Zachary's speech was not protected, so Plaintiffs' First Amendment retaliation claim fails, and Defendants are entitled to summary judgment on this claim.

**IV.  Equal Protection and Civil Conspiracy Claims**

Plaintiffs argue that Defendants violated Zachary's Fourteenth Amendment right to equal protection based on his race.  To state an equal protection claim, a plaintiff must show that "through state action, similarly situated persons have been treated disparately" and that the Defendants' actions were motivated by race.  *Draper v. Reynolds*, 369 F.3d 1270, 1278 n.14 (11th Cir. 2004) (internal

citation and quotation marks omitted).  Plaintiffs have pointed the Court to no evidence of any *similarly situated* persons who have been treated differently than Zachary.  Plaintiffs point the Court to instances in which white suspects were subdued with some type of force other than a beanbag munition, but there is no evidence that any of these white suspects was similarly situated to Zachary in terms of his alleged misconduct, the setting of his arrest or the events leading up to his arrest.  Plaintiffs also argue that Defendants' actions were motivated by discriminatory animus, contending that Coats had previously used deadly force against a black suspect but never used deadly force against a white person.  This evidence is not sufficient to show that Defendants' actions against Zachary were motivated by race.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' equal protection claim.

Likewise, Defendants are entitled to summary judgment on Plaintiffs' civil conspiracy claim under 42 U.S.C. § 1985(3), which provides a cause of action for a conspiracy to deprive "any person or class of persons of the equal protection of the laws."  The elements of a cause of action under § 1985(3) are:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

41

*Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001). Plaintiffs contend that Defendants conspired to injure Zachary on account of his race in violation of § 1985(3). However, as discussed above, Plaintiffs have not pointed to sufficient evidence from which a jury could conclude that Defendants' actions against Zachary were motivated by race. Accordingly, the Court grants Defendants' summary judgment motion as to Plaintiffs' civil conspiracy claim.

**V.   State Law Claims**

    A.   <u>City Liability</u>

To the extent that Plaintiffs assert state law claims against Columbus, the Court finds that Columbus is entitled to summary judgment as to all of Plaintiffs' state law claims because Columbus is entitled to sovereign immunity. The doctrine of sovereign immunity protects governments, including counties,[23] from suit unless they have waived their immunity. *Williams v. Whitfield County*, 289 Ga. App. 301, 302-03, 656 S.E.2d 584, 586 (2008). A county's sovereign immunity "may only be waived by a legislative act which specifically provides that sovereign immunity is waived and the extent of such waiver." *Id.* at 302, 656 S.E.2d at 586 (internal quotation marks omitted). Here, Plaintiffs have not established any waiver of immunity by Columbus, and Columbus is therefore entitled to summary judgment on Plaintiff's state law claims.

---

[23]The City is a consolidated city-county government, and the Court views the City as a county for purposes of the sovereign immunity inquiry. *See Bowen v. Columbus*, 256 Ga. 462, 462-63, 349 S.E.2d 740, 741-42 (1986).

42

B.    Individual Liability

As to Plaintiffs' state law claims against the individual Defendants, Defendants contend that they are entitled to official immunity.   A suit against a governmental employee sued in his individual capacity "is barred by official immunity where the public official has engaged in discretionary acts that are within the scope of his or her authority, and the official has not acted in a wilful or wanton manner; with actual malice; or with the actual intent to cause injury." *Brown v. Penland Const. Co.*, 281 Ga. 625, 625-26, 641 S.E.2d 522, 523 (2007).   Plaintiffs do not dispute that the individual Defendants were engaging in discretionary acts during the events giving rise to this case.

The next question is whether Defendants acted in a wilful or wanton manner, with actual malice, or actual intent to cause injury. "Actual malice" means "a deliberate intention to do wrong, and does not include 'implied malice,' i.e., the reckless disregard for the rights or safety of others." *Murphy v. Bajjani*, 282 Ga. 197, 203, 647 S.E.2d 54, 60 (2007) (internal quotation marks omitted).   A "deliberate intention to do wrong" is "the intent to cause the harm suffered by the plaintiffs." *Id.* Similarly, "actual intent to cause injury" means "an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury." *Kidd v. Coates*, 271 Ga. 33, 33, 518 S.E.2d 124, 125 (1999)

43

(internal quotation marks omitted).  The Court examines each of Plaintiffs' state law claims in turn below.

>   1.   *"Intentional Tort" and "Malicious Negligence" Claim*

In support of their "intentional tort" and "malicious negligence" claim, Plaintiffs contend that Defendants breached their duty as police officers not to use excessive force against Zachary. (*See* Compl. ¶ 102.)  Plaintiffs do not cite, and the Court cannot find, any basis in Georgia law for this claim, which is, in any event, duplicative of their Fourth Amendment and battery claims. Defendants are therefore entitled to summary judgment on this claim.

>   2.   *False Arrest Claim*

To prevail on their claim for false arrest under Georgia law, Plaintiffs must show that Coats, Hudson and Touchberry acted without probable cause and with malice.  O.C.G.A. § 51-7-1; *Anderson v. Cobb*, 258 Ga. App. 159, 160, 573 S.E.2d 417, 419 (2002).  As discussed above, these Defendants had arguable probable cause to arrest Zachary for violating Georgia's terroristic threats law.  Therefore, these Defendants did not act with malice or intent to cause injury when they arrested Zachary, and these Defendants are entitled to official immunity.  Thus, Plaintiffs' false arrest claim fails.

>   3.   *False Imprisonment Claim*

"False imprisonment is the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty."  O.C.G.A. § 51-7-20.  Plaintiffs contend that

Defendants falsely imprisoned Zachary by arresting him without probable cause and placing him under police supervision at the hospital.[24]   "[T]he defense of a warrantless arrest in a false imprisonment case must show that the arrest was made on probable cause and pursuant to the appropriate exigent circumstances." *Arbee v. Collins*, 219 Ga. App. 63, 66, 463 S.E.2d 922, 926 (1995) (citing O.C.G.A. § 17-4-20(a)). "Appropriate exigent circumstances" include (1) offense committed in an officer's presence or within his immediate knowledge, (2) suspect trying to escape, (3) probable cause to believe that an act of family violence has been committed, and (4) "other cause if there is likely to be failure of justice for want of a judicial officer to issue a warrant." O.C.G.A. § 17-4-20(a).  As discussed above, Defendants had arguable probable cause to arrest Zachary for violating Georgia's terroristic threats statute. Furthermore, the officers reasonably suspected that Zachary might harm either the officers or someone inside the house if they did not arrest Zachary.  Therefore, the Court cannot conclude that there is a genuine issue of material fact that Defendants acted with malice or intent to cause injury when they arrested Zachary and took him into custody, so Defendants are entitled to summary judgment based on official immunity as to Plaintiffs' false imprisonment claims.

> 4.   *Assault and Battery*

---

[24]Plaintiffs point to no evidence that either Boren, Hudson, Touchberry, or Coats was involved in the decision to place Zachary under police supervision in the hospital.

45

To state a claim for assault, Plaintiffs must show that the conduct of Coats, Hudson and Touchberry was not justified and that their conduct placed Zachary "in fear of an illegal, unauthorized physical contact." *Gardner v. Rogers*, 224 Ga. App. 165, 169, 480 S.E.2d 217, 221 (1996).  To state a claim for battery, Plaintiffs must show that Coats, Hudson and Touchberry "carried out the illegal contact." *Id.*  As discussed above, a jury could conclude that Coats, in accordance with the instructions of Hudson and Touchberry, placed Zachary in fear of unauthorized physical contact and then carried out the contact when he intentionally used deadly force against Zachary even though deadly force was not warranted under the circumstances.[25] Therefore, Coats, Hudson and Touchberry are not entitled to state official immunity as a matter of law as to Plaintiffs' assault and battery claims because a jury could conclude that their actions were intentional and carried out with wilfulness or malice, in violation of a known right. *See id.*  Their motion for summary judgment on Plaintiffs' assault and battery claims is therefore denied.

> 5.  *Intentional Infliction of Emotional Distress*

"A claim for intentional infliction of emotional distress has four elements: (1) intentional or reckless conduct (2) which is extreme and outrageous and (3) caused the emotional distress (4) which is severe." *Lewis v. Northside Hosp., Inc.*, 267 Ga. App. 288,

---

[25]Again, though Coats contends that he did not intend to hit Zachary in the spleen, he *did* hit Zachary in the spleen, creating a jury question as to whether he intended to do so.

292, 599 S.E.2d 267, 270 (2004) (internal quotation marks omitted). As discussed above, a jury could conclude that Coats, Hudson and Touchberry engaged in intentional (or reckless) conduct—shooting or causing Zachary to be shot in the spleen or center mass with the beanbag munition.  Such a shooting, without justification for the deadly force, is sufficiently extreme and outrageous.  A jury could conclude that Zachary suffered severe emotional distress; he was in the hospital, conscious and awake for at least part of the two days between the shooting and his death, aware that he had been shot and was severely injured.  A jury could also conclude that Coats, Hudson and Touchberry intended to cause Zachary severe emotional distress by shooting him (or directing him to be shot with) the beanbag munition, which was capable of causing severe physical injury or death. Therefore, Coats, Hudson and Touchberry are not entitled to official immunity as a matter of law on Plaintiffs' intentional infliction of emotional distress claim, and their motion for summary judgment on this claim is therefore denied.[26]

CONCLUSION

For the reasons discussed above, the Court grants Defendants' motion for summary judgment as to the following claims:

1.   Fourth Amendment unreasonable seizure claim.

---

[26]To the extent Plaintiffs seek to assert intentional infliction of emotional distress claims against any other individual Defendants, the Court concludes that Plaintiffs have not pointed to enough evidence to overcome official immunity.

47

2.   Fourth Amendment excessive force claim against Chief Boren in his individual capacity.

3.   Substantive due process claim.

4.   First Amendment claim.

5.   Equal protection claim.

6.   Civil conspiracy claim.

7.   "Intentional tort" and "malicious negligence" claim.

8.   False arrest claim.

9.   False imprisonment claim.

The Court denies summary judgment as to the following claims:

1.   Plaintiffs' § 1983 claims against Columbus for excessive force.

2.   Plaintiffs' § 1983 individual capacity claims against Bolen, Coats, Hudson and Touchberry for excessive force.

3.   Plaintiffs' assault and battery claims against Coats, Hudson and Touchberry.

4.   Plaintiffs' intentional infliction of emotional distress claims against Coats, Hudson and Touchberry.


CERTIFICATE OF IMMEDIATE APPEAL

In the Court's view, this Order, including the denial of summary judgment as to the officers in their individual capacities, is not directly appealable because genuine issues of material fact must be resolved by a jury before the Court can decide whether the officers are entitled to qualified immunity. *See Breeden*, 280 F.3d at 1317 ("[I]f the evidence at the summary judgment stage, viewed in the light most favorable to the plaintiff, shows there are facts that are

48

inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it will proceed to trial."). However, pursuant to 28 U.S.C. § 1292(b), the Court finds that Defendants sued in their individual capacities should be permitted to take an immediate appeal on the issue of qualified immunity. The Court is of the opinion that its rulings as to the qualified immunity issues in this case involve "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order" on the qualified immunity question "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The Court further finds that if the Court of Appeals determines that an appeal of the Court's rulings denying qualified immunity to the individual Defendants should be permitted, then judicial economy would be served by also reviewing the Court's ruling denying the City's motion for summary judgment on Plaintiffs' § 1983 excessive force claim.

IT IS SO ORDERED, this 2nd day of December, 2008.


S/Clay D. Land
                    CLAY D. LAND
            UNITED STATES DISTRICT JUDGE